**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**          RECEIVED

|  |  |
|---|---|
| Southern Independent Bank | )   **CLASS ACTION COMPLAINT**   A 10: 49 |
|  | )   **CV-**   DEBRA P. HACKETT, CLK |
| v. | )      U.S. DISTRICT COURT |
|  | )      MIDDLE DISTRICT ALA |
| Fred's Inc. | )   2:15-CV-799-MHT-WC |
|  | ) |
|  | ) |
|  | ) |

## SUMMARY OF ACTION

1.      From March 23 to April 24 of 2015, the sensitive financial and personal data of an unknown number of customers was compromised as a result of Fred's Inc. ("Fred's") failure to adequately secure payment information on its systems.

2.      An unauthorized person or persons accessed Fred's two servers that process electronic payments using malware designed to search for and obtain the information saved on a debit card's magnetic strip, including cardholders' name, card number, expiration date and verification code, in order to create counterfeit cards and/or make unauthorized withdrawals.

3.      The two servers that were accessed by hackers control, route, and house information regarding all electronic payments made by shoppers at all of Fred's stores.  Information from one server was collected by hackers through April 8, 2015 and information from the other server was collected by hackers through April 24, 2015.

4.      Fred's security protocols were so deficient the breach continued for over a month while Fred's failed to even detect it.

5.      The financial institutions that issued the debit cards involved in Fred's data breach have suffered substantial losses as a result of Fred's failure to adequately protect this sensitive payment data.  This includes, but is not limited to, sums associated with notifying customers of

1

the data breach, re-issuing debit cards, reimbursing customers for fraudulent transactions, monitoring customer accounts to prevent fraudulent charges, addressing customer confusion and complaints, changing or canceling accounts, and the decreased use or suspension of their customers' affected cards.

6.      Plaintiff seeks to recover damages and equitable relief on behalf of itself and all other similarly situated financial institutions in the United States.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (1) the Financial Institution Class (the FI Class) consists of more than 100 members; (2) the amount at issue is more than $5 million exclusive of interest and costs; and (3) minimal diversity exists as at least one plaintiff is a citizen of a different state than Defendant.

8.      This Court has jurisdiction over Fred's because the company regularly conducts business in Alabama, and has sufficient minimum contacts in Alabama, and Fred's which has its principal headquarters in Memphis, Tennessee, has intentionally availed itself of this jurisdiction by marketing and selling products in fifteen (15) states to millions of consumers (including in Alabama).

9.      Venue in this Court is appropriate pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events, acts, or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

10.     Plaintiff Southern Independent Bank (SIB) is an Alabama state-chartered community bank, insured by FDIC, based in Opp, Alabama, and operating branches since December, 2006, in Opp and Andalusia, Alabama.

11.     Plaintiff is one of many financial institutions that issue debit cards and/or perform, facilitate, or support debit card issuing services on behalf of their customers. Plaintiff's customers used these payment cards to make purchases at Fred's stores during the period of time that the data breach in question was ongoing.

12.     Defendant Fred's is a Tennessee corporation with its principal place of business located at 4300 New Getwell Road in Memphis, Tennessee 38118. Fred's is a discount general merchandise and pharmacy chain that was founded in 1947 and operates 641 company-owned stores as of January 31, 2015 in fifteen states, primarily in the southeastern United States. Fred's stores generally serve low, middle and fixed income families located in small- to medium-sized towns (approximately 85% of Fred's stores are in markets with populations of 15,000 or fewer people). *Source:* Fred's Annual Report, filed 4/16/2015.

## STATEMENT OF FACTS

13.     In March and April of 2015, the Company's computer systems were compromised and hackers obtained the personal and financial information of an unknown number of Fred's customers. The data breach easily could have been prevented as Fred's failed to take adequate and reasonable measures to ensure its data systems were protected, ignored clear warnings that intruders had breached its systems and failed to take actions that could have thwarted the breach. Because of Fred's numerous and preventable failures, the Plaintiff and the Financial Institution ("FI") Class it seeks to represent have suffered millions of dollars in damages.

3

14.     Through its actions and inaction, Fred's has violated statutory and common laws designed to prevent such disasters, and those violations have caused the Plaintiff and the FI Class to suffer substantial damages.

## Background on Electronic Debit Card Transactions

15.     When a customer initiates a debit (or credit) card transaction at a retailer such as Fred's, as with virtually all card transactions, the process of completing that transaction involves four principal actors: (1) a merchant (such as Fred's), where the initial purchase is made; (2) an acquiring bank (which is typically a financial institution that contracts with the merchant to process its card transactions); (3) a payment processor or card network (the system through which the transaction is conducted, *e.g.* Mastercard); and (4) the card issuer (which is a financial institution like Plaintiff and members of the FI Class, that issues debit cards to consumers).

16.     In general, to process a purchase using a debit card, a merchant first seeks authorization from the issuing bank for the transaction. In response, the issuing bank informs the merchant whether it will approve or decline the transaction (generating the familiar "transaction approved" or "card declined" messages at the point of purchase). Assuming the transaction is approved, the merchant then electronically forwards the receipt directly to its acquiring bank. The acquiring bank then pays the merchant (i.e., Fred's), forwards the final transaction data to the issuing bank, and the issuing bank reimburses the acquiring bank. The issuing bank (i.e., Plaintiff) then posts the charge to its customer's bank account associated with the debit card that was used.

17.     Given the extensive network of financial institutions involved in retail transactions and the sheer volume of daily transactions using debit cards, it is not surprising that financial institutions and card processing companies have issued rules and standards governing the basic measures that merchants must take to ensure that valuable transactional data is protected. First,

4

the card companies issue regulations ("Card Operating Regulations") that are enforceable upon Fred's as a condition of Fred's contract with its acquiring bank. The Card Operating Regulations prohibit Fred's (or any merchant) from disclosing any cardholder account numbers, personal information, magnetic stripe information, or transaction information to third parties other than the merchant's agent, the acquiring bank, or the acquiring bank's agents. Under the Card Operating Regulations, Fred's was required to maintain the security and confidentiality of debit cardholder information and magnetic stripe information and protect it from unauthorized disclosure.

18.     Similarly, the Payment Card Industry Data Security Standards ("PCI DSS") are a list of twelve information security requirements promulgated by the Payment Card Industry Security Standards Council. They apply to all organizations and environments where cardholder data is stored, processed, or transmitted and require merchants like Fred's to protect cardholder data, ensure the maintenance of vulnerability management programs, implement strong access control measures, regularly monitor and test networks and ensure the maintenance of information security policies. In addition, the PCI DSS prohibited Fred's from retaining certain customer data. Specifically, the PCI DSS 2.0 requires merchants to adhere to the following rules:

### Build and Maintain a Secure Network

- Install and maintain a firewall configuration to protect cardholder data
- Do not use vendor-supplied defaults for system passwords and other security parameters

### Protect Cardholder Data

- Protect stored cardholder data
- Encrypt transmission of cardholder data and sensitive information across public networks

### Maintain a Vulnerability Management Program

- Use and regularly update anti-virus software or programs

5

- Develop and maintain secure systems and applications

### Implement Strong Access Control Measures

- Restrict access to cardholder data by business need-to-know
- Assign a unique ID to each person with computer access
- Restrict physical access to cardholder data

### Regularly Monitor and Test Networks

- Track and monitor all access to network resources and cardholder data
- Regularly test security systems and processes

### Maintain an Information Security Policy

- Maintain a policy that addresses information security for all personnel

19.     Fred's was at all times fully cognizant of its data protection obligations in light of the existing web of regulations requiring Fred's to take affirmative steps to protect the sensitive financial information entrusted to it by consumers and the financial institutions that participate in and administer debit card processing systems.

20.     Despite this, Fred's treatment of the sensitive personal and financial information entrusted to it by its customers and the Plaintiff fell woefully short of its legal duties and obligations. Fred's failed to ensure that access to its data systems was reasonably guarded, and failed to acknowledge numerous warning signs and properly utilize its own security systems that were put in place to detect and deter this exact type of attack.

6

## Leading Up to the Breach

21.     At the time of the breach, Fred's had specific notice of the potential attacks that could occur on merchant systems, and of the potential risks posed to the Company and to financial institutions such as the Plaintiff and the FI Class if Fred's failed to adequately protect its systems.

22.     As early as 2005, a notorious IT systems hacker, Albert Gonzalez, masterminded and implemented one of the largest coordinated data breaches in history, ultimately compromising more than 170 million credit and debit card accounts by infecting retailers' point of sale ("POS") terminals with malicious software (also known as malware) which transmitted, unencrypted, the financial data being processed by the POS machine to Gonzalez and his accomplices. In the end, Gonzalez and his cohorts were able to walk off with vast amounts of customer data from various retailers.

23.     Several noteworthy reports published in 2013 put, or should have put, all merchants on notice of the increase in cyber-attacks on U.S. retailers. For instance, the U.S. government and several private research firms distributed industry-wide memos in 2013 on the emergence of new types of malicious computer code targeting retailers.

24.     Visa Corporation also issued reports in April and August, 2013, alerting merchants like Fred's to attacks using RAM scraper malware, or memory parsing software, which enables cyber criminals to grab encrypted data by capturing it when it travels through the live memory of a computer. The reports detailed how the attacks were being launched and provided advice on thwarting them.

25.     Visa warned merchants that, "[s]ince January 2013, Visa has seen an increase in network intrusions involving retail merchants," explaining hackers would "install memory parser

malware on the Windows based cash register system in each lane or on Back-of-the-House (BOH) servers to extract full magnetic stripe data."

26.     To guard against this threat, the Visa warnings instructed merchants to, among other things, review its "firewall configuration and ensure only allowed ports, services and IP addresses are communicating with your network"; "segregate the payment processing network from other non-payment processing networks"; "implement hardware-based point-to-point encryption"; "perform periodic scans on systems to identify storage of cardholder data and securely delete the data"; and "assign strong passwords to your security solution to prevent application modification." Fred's did not implement these measures.

27.     From June to August 2013, hackers in Eastern Europe began poking around the computer networks of various major U.S. retailers. The hackers were searching for routes that would take them deep into the retailer's corporate computer systems.

28.     Fred's itself recognizes that it faces risk in collecting and failing to protect customers' personal information, but does not consider the losses that would be suffered by the Plaintiff and the FI Class:

> **If we fail to protect the security of personal information about our customer, we could be subject to costly government enforcement actions or private litigation and our reputation could suffer.**
>
> The nature of our business involves the receipt of personal information about our customers. If we experience a data security breach, we could be exposed to government enforcement actions and private litigation.   In addition, our customers could lose confidence in our ability to protect their personal information, which could cause them to discontinue usage of credit cards in our stores, decline to use our pharmacy department services, or stop shopping at our stores altogether. Such events could lead to lost future sales and adversely affect our results of operations.

Source: Fred's Annual report, p. 12.

8

**Fred's Security Breach**

29.     On March 23, 2015, the Fred's data breach began.

30.     An unauthorized person gained access to Fred's two servers that payment card data is routed through after the cards are swiped in Fred's stores.

31.     The hackers were able to place a program within each of the two servers that was capable of making a copy of payment card data, that is, all the data from the magnetic stripe of payment cards (Track 2 data), including the customers' name, card number, expiration date and verification code.

32.     Fred's computer network was not properly protected to ensure its most sensitive parts were walled off from outsiders as well as the other parts of the network. The hackers exploited this gaping hole and uploaded their malware onto the most sensitive part of Fred's computer system – its customer payments and personal data network. Further, the hackers accessed both of Fred's servers, displaying an obvious breach in the company's lax protocols.

33.     Once inside Fred's servers containing customer payments and personal data, the hackers were freely able to upload data from customers that made purchases at Fred's store. This can be accomplished using exfiltration malware – programs that take the stolen information and move it from Fred's computer systems to the hackers' computer systems. Security software exists that can detect these types of malware on systems and prevent the uploading of the stolen data, but Fred's systems did not contain such security software.

34.     As a result, the hack continued on Fred's servers for the duration of the planned attack. One server was compromised from March 23 through April 8, and the other server was compromised from March 23 through April 24.

35.     During this time, Fred's took no action to stop the attack.

9

36.     The data breach was preventable.  Fred's could have blocked the effect of the hackers' malware by installing more rigorous security devices and being more diligent in its efforts to protect customer information.

37.     Information stolen from Fred's systems quickly entered the black market[1], with the hackers quickly trying to sell the valuable information they had stolen.  It was only upon learning of this systematic pattern of fraud that Fred's recognized its systems had been breached.

38.     On July 29, 2015, Mastercard informed banks of a "security breach of a United States based merchant impacting multiple locations."  The date range of the at-risk time period was listed as March 23 through April 24 of 2015.  However, Plaintiff was not informed immediately where the security breach specifically occurred and faced numerous inquiries from customers demanding to know.  Plaintiff expended many hours tracking where the breach occurred to learn that it was Fred's.

39.     Fred's unreasonable data policies have cost the Plaintiff and the FI Class millions of dollars of damages.

40.     Fred's collection of data on its customers is extensive.  Fred's collects information on every person who regularly walks into one of its stores.  It has the capacity to assign each shopper a unique code that keeps tabs on everything they buy, and also tracks the manner by which payment is made, the use of coupons, contact with the store and the frequency of returns.

41.     Even though Fred's recognizes the risk of failing to protect customers' personal information, it had not prioritized security: it was failing to adhere to industry standards regarding the retention and use of debit card information, did not have adequate security on its systems to encrypt the stripe information, did not have adequate anti-malware software, and did

---

[1] The black market for credit card and debit card numbers is highly sophisticated, with numerous card-selling sites that are indistinguishable from a modern-day e-commerce site.  Many sell cards in bulk to account for the possibility of cancellations.  Some go for as little as a quarter; corporate cards can sell for as much as $45.

not have adequate security to otherwise protect against cyberattacks, and failed to properly update and maintain the security it had. Fred's further failed to adequately test and monitor its system for cyberattacks. These failures led to its vulnerability, but also may have put hackers on notice this retailer was cataloging and maintaining the debit card information of all of its customers for the taking.

### The Fallout Continues for Financial Institutions and Their Customers

42.     The biggest threat is for people who shopped at Fred's using debit cards, which withdraw money directly from users' checking accounts. Laws are less protective of debit cards, and possession of a stolen PIN number could mean unauthorized access at an ATM.

43.     Plaintiff and the FI Class are primarily responsible for paying for card replacement and for reimbursing fraudulent charges. While a consumer may ultimately be protected from these costs, Plaintiffs and the FI Class are not.

44.     Fred's completely avoidable data breach inflicted significant financial damage upon the Plaintiff and the FI Class, who had to act immediately to mitigate present debit card fraud, while simultaneously taking steps to prevent future fraud and while continuing to meet the demands and needs of their customers.

45.     The Plaintiff and the FI Class were forced to dedicate significant capital and human resources to the task of addressing the breach including, but not limited to, reissuing debit cards, changing or closing accounts, notifying customers of the breach of their cards, investigating claims of fraudulent activity, refunding customers for fraudulent charges, and increasing fraud monitoring on potentially impacted accounts. The Plaintiff and the FI Class also lost interest and transaction fees (including interchange fees) as a result of decreased, or ceased, card usage in the wake of this data breach.

11

46.     The costs suffered by the Plaintiff and the FI Class as a result of Fred's data breach will continue to mount.

## CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action on behalf of itself and all other financial institutions similarly situated and, accordingly, allege all claims herein on a common, class-wide basis, pursuant to Fed. R. Civ. P. 23.

48.     The FI Class is defined as follows:

> Financial institutions—including, but not limited to, banks and credit unions—in the United States (including its Territories and the District of Columbia) that issue debit cards or perform, facilitate, or support card issuing services, whose customers made purchases from Fred's stores from March 23 to April 24 of 2015 (the "FI Class").

49.     Excluded from the FI Class is Fred's and any of its parents, affiliates, or subsidiaries as well as any successors in interest or assigns of Fred's, the attorneys representing the class and the Judge assigned this litigation.

50.     All Plaintiffs are members of the FI Class, as defined above.

51.     The members of the FI Class are readily ascertainable and Fred's likely has access to addresses and other contact information that may be used for providing notice to FI Class members.

52.     The members of the FI Class are so numerous that joinder of all members would be impracticable. Upon information and belief, the data breach at issue impacted hundreds, if not thousands, of financial institutions spread across the entire South and Midwest regions of the United States, and possibly beyond.

53.     There are substantial questions of law and fact common to the FI Class that predominate over questions affecting only individual FI Class members including, but not limited to, the following:

    a. Whether Fred's owed a duty to the Plaintiff and the FI Class to adequately protect the personal and financial information of its shoppers and the FI's customers;

    b. Whether Fred's breached its duty to protect the personal and financial information of its shoppers and the FI customers by failing to provide adequate security;

    c. Whether Fred's conduct (or lack thereof) was the direct and proximate cause of the breach of its systems, which resulted in the loss of consumers' personal and financial data;

    d. Whether Fred's improperly retained sales transaction data beyond the period of time permitted by law;.

    f. Whether Fred's negligently failed to inform the Plaintiff and the FI Class regarding the vulnerabilities of its data protection systems, measures and practices;

    g. Whether the Plaintiff and the FI Class suffered financial injury as a result of Fred's conduct (or lack thereof);

    h. Whether the Plaintiff and the FI Class are entitled to injunctive relief; and

    i. What is the appropriate measure of damages sustained by the Plaintiff and the FI Class?

54.     Plaintiff's claims are typical of the FI Class.  The same events and conduct that give rise to Plaintiff's claims are identical to those that give rise to the claims of every other FI Class member because each Plaintiff is a financial institution that has suffered harm as a direct and proximate cause of the same, specific data breach described herein.

55.     Plaintiff's interests are consistent with and not antagonistic to those of the other members of the FI Class.

56.     Plaintiff will fairly and adequately represent the interests of the FI Class.  Plaintiff has retained counsel who are experienced and qualified in prosecuting class action cases similar to this one.

13

57.     Neither Plaintiff nor their attorneys have any interest contrary to or conflicting with those of other members of the FI Class.

58.     A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the other FI Class members' claims is economically unfeasible and procedurally impracticable.  Litigating the claims of the FI Class together will prevent varying, inconsistent, or contradictory judgments, and will prevent delay and unnecessary expense to the parties and the courts.

## COUNT ONE
### (Negligence)

59.     The Plaintiff incorporates and re-alleges all allegations above as if fully set forth herein.

60.     Fred's owed a duty to the Plaintiff and the FI Class to use and exercise reasonable and due care in obtaining, retaining, securing, and deleting the personal and financial information of customers who used debit cards issued by the Plaintiff and the FI Class to make purchases at Fred's stores.

61.     Fred's owed a duty to Plaintiffs and the FI Class to provide security, consistent with industry standards and requirements, to ensure that its computer systems and networks, and the personnel responsible for them, adequately protected the personal and financial information of customers who used debit cards issued by the Plaintiff and the FI Class to make purchases at Fred's stores.

62.     Fred's owed a duty of care to the Plaintiff and the FI Class because they were a foreseeable and probable victim of any inadequate data security practices.  Fred's solicited, gathered, and stored the sensitive financial data provided by the Plaintiff and the FI Class to facilitate sales transactions with shoppers.  Fred's knew it inadequately safeguarded this information on its computer systems and that hackers would attempt to access this valuable data

14

without authorization. Fred's knew that a breach of its systems would inflict millions of dollars of damages upon the FI Class, and Fred's was therefore charged with a duty to adequately protect this critically sensitive information.

63.     Fred's maintained a special relationship with the FI Class. The FI Class entrusted Fred's with the personal and financial information of customers using debit cards issued by them on the premise that Fred's would safeguard this information, and Fred's was in a position to protect against the harm suffered by the FI Class as a result of the data security breach.

64.     In light of its special relationship, Fred's knew, or should have known, of the risks inherent in collecting and storing the personal and financial information of shoppers using debit cards issued by the Plaintiff and the FI Class, and the importance of providing adequate security of that information.

65.     Fred's own conduct also created a foreseeable risk of harm to the FI Class. Its misconduct included, but was not limited to, it not following broadly accepted security practices and not complying with industry standards for the safekeeping and maintenance of customers' personal and financial information.

66.     Fred's breached the duties it owed to the Plaintiff and the FI Class by failing to exercise reasonable care and implement adequate security protocols—including protocols required by industry rules—sufficient to protect the personal and financial information of customers using debit cards issued by the Plaintiff and the FI Class.

67.     Fred's breached the duties it owed to the Plaintiff and the FI Class by failing to properly implement technical systems or security practices that could have prevented the loss of the data at issue.

68.     Fred's breached the duties it owed to the Plaintiff and the FI Class by failing to properly maintain the sensitive personal and financial information of customers using debit cards issued by Plaintiffs and the FI Class. Given the risk involved and the amount of data at issue, Fred's breach of its duty was entirely unreasonable.

69.     Fred's also knew that the Plaintiff and the FI Class were foreseeable victims of a data breach of its systems because of specific laws, regulations, and guidelines that require merchants like Fred's to reasonably safeguard sensitive payment information or be held liable in the event of a data breach.

70.     As a direct and proximate result of Fred's negligent conduct, the Plaintiff and the FI Class has suffered injury and are entitled to damages in an amount to be proven at trial.

## COUNT TWO
## (Negligent Misrepresentation)

71.     Plaintiff incorporates and re-alleges all allegations above as if fully set forth herein.

72.     Through its Privacy Policy and other actions and representations, Fred's misrepresented to the Plaintiff and the FI Class that it possessed and maintained adequate data security measures and systems that were sufficient to protect the personal and financial information of shoppers using debit cards issued by the Plaintiff and the FI Class.

73.     Fred's further misrepresented that it would secure and protect the personal and financial information of shoppers using debit cards issued by the Plaintiff and the FI Class by agreeing to comply with both Card Operating Regulations and the PCI DSS.

74.     Fred's knew or should have known that it was not in compliance with the representations made in its Privacy Policy, and the requirements of Card Operating Regulations and the PCI DSS.

16

75. Fred's knowingly and deliberately failed to disclose material weaknesses in its data security systems and procedures that good faith and common decency required it to disclose to the Plaintiff and the FI Class.

76. A reasonable business would have disclosed information concerning material weaknesses in its data security measures and systems to the Plaintiff and the FI Class.

77. Fred's also failed to exercise reasonable care when it failed to timely communicate information concerning the data breach that it knew, or should have known, compromised the personal and financial information of customers using debit cards issued by the Plaintiff and the FI Class.

78. Plaintiff and the FI Class relied upon these misrepresentations and omission to their detriment.

79. As a direct and proximate result of Fred's negligent misrepresentations by omission, Plaintiffs and the FI Class have suffered injury and are entitled to damages in an amount to be proven at trial.

17

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of itself and the FI Class, respectfully requests that the Court enter judgment in their favor as follows:

a. certifying the FI Class under Fed. R. Civ. P. 23 and appointing Plaintiff and its counsel to represent the Class pursuant to Fed. R. Civ. P. 23(g);

b. awarding Plaintiff and the FI Class monetary damages as allowable by law;

c. awarding Plaintiff and the FI Class appropriate equitable relief;

d. awarding Plaintiff and the FI Class pre-judgment and post judgment interest;

e. awarding Plaintiff and the FI Class reasonable attorneys' fees and costs as allowable by law; and

f. awarding all such further relief as allowable by law.

## JURY TRIAL DEMANDED

Plaintiffs, on behalf of themselves and the FI Class, demand a trial by jury on all issues so triable.

Joseph "Jay" H. Aughtman
Aughtman Law Firm, LLC
1772 Platt Place
Montgomery, AL 36117
Phone:  (334) 215-9873
Fax:     (334) 213-5663

Richard M. Golomb, Esquire (*Pro hac vice pending*)
Kenneth J. Grunfeld, Esquire (*Pro hac vice pending*)
**GOLOMB & HONIK, P.C.**
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Phone: (215) 985-9177
Fax:    (215) 985-4169

Wesley L. Laird, Esquire
Laird Baker & Blackstock LLC
501 N. Main Street
Opp, AL 36467
Phone: 334.493.9716
Fax:    334.469.9715

*Attorneys for Plaintiff and the Class*

Dated: October 30, 2015